721 So.2d 772 (1998)
Thomas RUSSO, and Robin Russo, his wife, Appellants,
v.
LAKE BUENA VISTA COMMUNITIES, INC., Appellee.
No. 97-1271.
District Court of Appeal of Florida, Fifth District.
November 20, 1998.
Steven M. Meyers, of Meyers, Mooney & Meyers, Orlando, for appellants.
John W. Smith and Frank D. Hosley, of Roth, Edwards & Smith, P.A., Orlando, for appellee.
*773 GRIFFIN, C.J.
Thomas Russo ("Russo") and Robin Russo ("Robin"), his wife, (collectively "the Russos"), appeal an adverse summary final judgment on their claim for damages allegedly suffered in the Walt Disney World theme park.
Thomas Russo, a forty-eight-year-old diabetic suffering from chronic complications of peripheral vascular disease aggravated by smoking and advanced heart disease, underwent the amputation of his lower left leg in 1992. In August of 1994, Russo planned a trip to Walt Disney World with his family. Because of the prolonged walking he anticipated, he called the Walt Disney World reservation office to reserve an electric scooter.
Russo, his wife, and their two-year-old handicapped daughter, Tiffany, arrived at the Magic Kingdom parking lot at approximately 9:00 a.m. and paid a fee to park their van. Using his prosthesis, Russo boarded a tram and then walked to the ticket transportation center, where he understood he would be able to rent the electric scooter. A Disney employee advised him, however, that electric scooters were available only inside the Magic Kingdom. Russo was not interested in a manual wheelchair because of his heart condition, so Russo and his family walked approximately 100 yards to take a ferry boat to the entrance of the Magic Kingdom and to the wheelchair/electric scooter rental facility.
As Russo entered the Magic Kingdom, he noticed a wet feeling in his prosthetic sock, along with a slight burning sensation. He realized that he had a water blister on the bottom of his stump which had broken. For that reason, after he rented the electric scooter, he took off his prosthesis and placed it across his lap. He remained in his scooter and kept his prosthesis off during his entire visit to the Magic Kingdom, with the exception of standing one time to use a urinal.
At the end of the family's visit in the park, sometime between 1:00 and 2:00 p.m., they returned to the same wheelchair rental facility. During the course of the day, Russo's stump had become swollen, and when he reached the rental facility, the stump was still swollen, he still had the water blister, and he also had some pain in the stump. In fact, his stump had swollen to the point where he did not believe he could safely reattach his prosthesis and walk the incline to the monorail.
Because of these medical problems, and because of his fears of trying to reattach his prosthesis, Russo claims that he advised an employee at the wheelchair rental facility of his dilemma. Specifically, he advised the employee that his stump had swollen and that he did not think he could reattach his prosthesis and walk to his car:
And I asked the girl, is it all right if I take the scooter out to the tram because I'm having trouble with my stump, and I raised the stump up to her, and she said, "No, no, you can't, you can't take it past this point," and she pointed to like a little fence they have there that separates the, where you can't get in I guess without a ticket.
So I said, "Well, you don't understand the problem," I said, "I can't put my prosthesis back on right now I don't think," I said, "I think I'm going to have to take this out to the front." I said, "I tell you what, I left you a $20 deposit, have somebody follow me out there and bring it back and you can keep the 20 bucks."
She says, "No, no," she says, "I'm sorry, you can't."
At no point did the employee offer any other options for Russo to get to his car, including the use of a manual wheelchair.
Russo claims he then spoke with a manager at the rental facility. Russo asked the manager if he could use the scooter to get to his car. He advised the manager, "... I'm having a problem with my stump, I got a blister on it and it's swolled up now." The manager refused to allow Russo to take the scooter to the car. Russo, now angry, advised the manager that reattaching his prosthesis and walking to his car was probably going to be very painful and cause further injury to his leg:
I looked at the guy and I said, "Don't you understand my problem? I can't even get out of this park, what are you talking about me going to another park for?" I said, "Do you understand what I'm saying?" *774 I said, "I'm having trouble right now and I need to get out to the car, out to the tram at least."
He says, he repeats the same thing to me again, about well, you know, I can get you a free one at anotherif you want to go to Sea World, you know, and then, you know, then I start cursing at the guy ... I just said, "Don't you understand F-ing English," you know, I got really hot about it, I said, you know, "What the F- is it going to take," you know, "to make you understand," so I said, "What you're doing," I said, "you're forcing me to put the leg back on and walk out of the park," and I said, "It's going to be very painful," I said, "it's probably going to do more damage," I said.
He said, he got really like cocky, "Well, you should have made those arrangements before you came."
Exasperated, Russo turned to his wife, and told her "Listen, let's get out of here before I have a homicide on my hands." Robin remembers the altercation creating a scene:
It got loud and people were staring and a little crowd developed and the man didn't understand.
He never offered us any other alternative to get out of the park. He neverthere was nothing offered. There was no other option to go.
He said, "You can't take the scooter past this point. That's the way it is, sir." And that was the conversation.
Although Russo was in obvious pain, he wanted "to get the hell out of there" and opted to leave without requesting medical assistance, a decision he later regretted:
... I never thought it would escalate into what it did escalate into. If I did know that I would have threw myself on the floor right at that spot and demanded they get me out of the park with a stretcher or whatever they wanted to do but I never thought it was going to come to this.[1]
Russo stood, and using his body weight, forced his swollen and blistered stump into his prosthesis. He and his family then walked to the monorail, where he had to use the handrails to pull himself up the ramp leading to the monorail. Upon exiting the monorail, he experienced excruciating pain while walking down the exit ramp.
By the time Russo exited the monorail facility, he was in such pain that he had to stop and rest for about fifteen minutes. He then resumed his walk on his prosthesis to the tram, using his daughter's stroller as a walker. After exiting the tram, Robin brought the car around and Russo removed his prosthesis. Russo had a hole in the bottom of his stump and approximately two inches of blood had pooled in the prosthesis.
Because Russo was unwilling to drive back to his home in Boca Raton in his condition, and because he was not able to take care of his handicapped daughter while his wife drove, the Russos remained in Orlando overnight. Robin is a registered nurse, and she helped Russo clean and ice his wound. The following morning, the family drove to Ft. Lauderdale, where Russo was seen by Dr. Erwin Vasquez, his primary treating physician and cardiac internist. Dr. Vasquez immediately admitted Russo to the hospital where he was diagnosed as having, among other things, gangrene in his left stump. He subsequently had to undergo almost two years of treatment for this condition, including six surgical procedures, and further amputation of his stump.
The Russos filed a two count complaint for negligence and loss of consortium against Walt Disney World Company for the injuries Russo allegedly sustained within the Magic Kingdom. The complaint was amended to substitute Lake Buena Vista Communities, Inc., ("Disney") as the proper defendant. The Russos contend that Disney breached its duty to exercise reasonable care for Russo's safety when, inter alia, its employees refused to allow him to take the electric scooter outside the park. The Russos theorized that when a business rents a scooter to an amputee, and then takes that scooter away, after being informed that he has a medical problem *775 with his stump and cannot safely reattach his prosthesis, the business breaches a duty of care by "creating" a "foreseeable zone of risk ." Disney filed its answer asserting that it owed no duty to the plaintiffs and pleaded, inter alia, affirmative defenses of comparative negligence, assumption of the risk, set-off, and failure to state a cause of action. Discovery was taken and Disney filed a motion for summary judgment.
At the hearing on the summary judgment motion, the lower court expressed its "misgivings" about the conduct of Disney's employees but, nevertheless, entered final summary judgment in favor of Disney. The court found no liability in tort based on a duty on Disney's part to let Russo take the scooter out of the park. If the events unfolded as alleged, we share the lower court's distaste for Disney's behavior but we agree that, by refusing to let him take the scooter to his car, Disney did not breach a legal duty giving rise to a claim in negligence for his injuries. The Eleventh Circuit Court of Appeals recently observed that the law does not penalize all behavior that strays from the ideal, quoting John Stuart Mill:
"[T]here are ... things ... which we wish that people should do, which we like or admire them for doing, perhaps dislike or despise them for not doing, but yet admit that they are not bound to do."
United States v. Brown, 79 F.3d 1550, 1562 (11th Cir.1996) (quoting John Stuart Mill, Utilitarianism 60 (O. Piest, ed., Bobbs-Merrill 1957) (1861)).
AFFIRMED.
HARRIS, J., concurs.
DAUKSCH, J., dissents, without opinion.
NOTES
[1] If Russo had simply announced himself unable to move, there may have been a duty on Disney's part to remove him safely.